J-A03028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| T.H. N/K/A T.D. | : | |
| | : | |
| Appellant | : | No. 2620 EDA 2017 |

Appeal from the Order Entered July 14, 2017
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2015-FC-0976

BEFORE:   GANTMAN, P.J., McLAUGHLIN, J., and PLATT*, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 10, 2018**

In this custody case, T.H. n/k/a T.D. ("Mother") appeals from the order awarding primary physical custody of the parties' minor daughter, A.H. ("Child"), to T.H. ("Father"); partial physical custody to Mother; and shared legal custody to Father and Mother. Mother raises ten issues on appeal that, in general terms, challenge the sufficiency of the evidence and the weight the trial court accorded various aspects of the evidence. We affirm.

The parties are the biological parents of Child, born in Bethlehem, Pennsylvania in December 2011. Mother and Father were married but eventually separated, and later divorced. Mother has two other daughters, ages 17 and 11. While the family was on vacation in Florida in 2013, Mother decided to remain there with Child and her daughters. Father returned home to his job and his other daughter in Pennsylvania. Four months later, Mother returned to Pennsylvania for a while, and then in February 2015 moved to

_____

*   Retired Senior Judge assigned to the Superior Court.

Georgia with Child and her daughters, where X.D. ("Stepfather") was stationed in the Army. However, two months later, in April 2015, Child and Mother's other two children returned to Pennsylvania; Mother remained in Georgia. Stepfather then received orders to relocate to El Paso, Texas.

In anticipation of Mother's relocation to El Paso, in July 2015, Father initiated the instant custody action. Following a court conference, the parties agreed to share legal custody of Child, but to alternate physical custody by exchanging Child every three months. Typically, the parties would each drive to a central meeting point in Arkansas, where they would make the exchange.

In December 2015, Father filed a contempt petition against Mother, asserting, among other things, that she had violated the custody arrangement by failing to return Child on time in December 2015. Following a conference, Father agreed to withdraw the petition in exchange for "make-up" custody time. The court ordered the parties to submit Child and themselves to a counseling program in Allentown "for purposes of addressing the minor child's separation issues." Order, 12/23/15, at ¶ 8.

Mother and Father then operated under the shared custody agreement until October 2016, when Mother filed a petition to modify custody in anticipation of Child starting kindergarten in mid-2017 (according to Mother, the academic year in Texas starts at the end of July). The court held a hearing on Mother's petition on July 13, 2017, at which the parties presented evidence of the following.

Mother lives in Texas with Stepfather, whom she married in February 2017, and her two other daughters, ages 17 and 11, who have known Child since her birth. Mother is a certified nurse's assistant and is currently in a 20-month program to become an occupational therapy assistant. Stepfather retired from the Army in 2017 and receives retirement and disability pay. Stepfather has custody of his two biological children, approximately 7 and 9 years old, during all summer vacations and some winter vacations. Other than her children, Mother has no close relatives near El Paso. Mother has been married four times. Child has positive bonds with Stepfather and her half-siblings in Texas.

Mother testified that if she was given primary physical custody, Child would attend a nearby kindergarten from 7:30 a.m. until 2:30 p.m., and would not need daycare because Stepfather would be home to care for her while Mother is at school and work. Stepfather, however, testified that he intended to enroll in a 24-month information technology program and would be attending classes from 8 a.m. until 12 p.m., Monday through Thursday, with online courses only on Fridays.

Father lives in Pennsylvania and works Sunday through Wednesday as a forklift operator. Father has been married only once (to Mother), and has one other biological child, who is approximately 9 years old. He has custody of his other child Thursday through Sunday. Father has been dating his girlfriend, K.R., since Spring 2016. K.R. has her own home, but stays almost

every night at Father's home. She has a 3-year-old son, works from home full-time as a medical coder, and is working towards a master's degree.

Father testified that, if given primary custody, Child would attend a nearby full-day kindergarten at the same elementary school as Father's older child. Paternal grandparents testified that they have assisted Father with childcare and will continue to do so. Father also has a brother and uncle who live nearby. When Child is in Father's custody and Father is at work, Child is usually in daycare.

Child has allergies and asthma and Mother contended that Child breathes better in Texas than in Pennsylvania. Mother testified that in April 2017, Child's allergies caused her tonsils to become enlarged. Mother stated that although the situation was not an emergency, she did not trust Father to take care of the issue while Child was in Pennsylvania. She said that she attempted to inform Father that Child was to undergo a tonsillectomy, but Father did not respond. She stated that his failure to reply delayed the removal of Child's tonsils, which in turn delayed medical clearance for Child to travel to Pennsylvania, and ultimately resulted in Child's returning late to Father. Mother argued the exchange was further pushed back by Father's delay in providing Mother with the name of the allergist who would be administering Child's allergy shots in Pennsylvania. Mother corroborated her account with evidence of her attempts to communicate with Father about this issue, as well as her attorney's communication with Father's attorney when she received no response.

Father, however, testified that Mother did not tell him about Child's tonsillectomy until the night after the surgery. As for the allergist, Father said that he had difficulty scheduling an appointment because it took a week for the Texas allergist to fax Child's records, and the Pennsylvania allergist did not believe Child needed the treatment. Father said that he did not remember receiving the text messages or e-mails from Mother requesting the parties speak about Child's medical condition. Father presented his response to Mother in which he provided the name of the allergist in Pennsylvania and confirmed that he had scheduled an appointment.

Mother testified that Child attends weekly counseling while she is in Mother's care. Mother claimed that "[Child's] physician in Texas felt that since she goes between Pennsylvania and Texas every three months, that is a lot of adjustment for a child, so he wanted her to have an outlet that was outside all of us." N.T., 7/13/17, at 35. Mother said that Father did not enroll Child in counseling until a year after the court ordered him to do so.

Mother explained the circumstances surrounding Father's 2015 petition for contempt as follows. Mother said she did not return Child in December 2015, so that Child could participate in a school holiday recital, and by agreement of the parties, Father received make-up custody time. Mother acknowledged that the same issue arose in 2016, but claimed Father again agreed to the late exchange so Child could participate in a recital.

Mother and Father presented the trial court with competing custody arrangements. Mother proposed that Child would reside with her during the

school year, and fly to Pennsylvania to reside with Father for two weeks every nine weeks, as well as during school breaks, including Thanksgiving break, winter break, and summer vacations. According to Mother, because the Texas school has longer breaks than the school in Pennsylvania, her arrangement would afford Father custody for 109 days during the calendar year. Mother contended that in contrast, if Child resided with Father in Pennsylvania during the school year, Mother would only have custody of Child for 67 days of each calendar year. Father proposed that he have primary custody of Child during the school year, and that Child visit Mother during the summer, winter, Thanksgiving, and spring breaks, and whenever Mother is in the Allentown area.

At the conclusion of the hearing, the court awarded Father primary physical custody of Child, gave Mother partial physical custody during Child's summer and spring breaks, and half of each winter vacation, and awarded shared legal custody. In its Pa.R.A.P. 1925(a) opinion, the court explained that it found that Father is more likely to encourage contact between Mother and Child, and that Mother has violated the custody schedule on several occasions. The court found Mother's credibility to be suspect, in part because Stepfather had contradicted Mother's testimony that he would be at home to care for Child. The Court also noted that Mother admitted that the frequent custody exchanges had spurred the need for Child's therapy. The court also found that Father offered Child a more stable life than Mother:

Father is established in the Allentown/Bethlehem area with a steady job, another daughter [of] whom he has partial custody, extended family and a girlfriend with an established job and child. Mother is not established in El Paso. Her husband, [Stepfather], is not employed; he receives disability. He plans to attend college, but there is no basis to believe he cannot do so elsewhere and have the same educational and occupational opportunities available to him as in El Paso. Mother is changing her job and profession. She, too, attends school in El Paso, but there is no basis to believe she cannot do so elsewhere and have the same educational and occupational opportunities available to her as in El Paso. Neither Mother nor [Stepfather] have any extended family in El Paso.

Trial Ct. Op. at 15. Based on its findings, the trial court concluded that it was in the best interest of Child to reside primarily with Father.

Mother filed this timely appeal and raises the following issues:

I. Did the [t]rial [c]ourt err in granting primary physical custody of [C]hild to [Father] premised on the assumption that it would not be in the best interest of [C]hild for a custodial exchange to occur every [n]ine (9) weeks vi[s]-a-vis flight when, in fact, the parties have been exchanging custody every [n]inety (90) days by automobile travel with no adverse effects whatsoever to [C]hild?

II. Did the [t]rial [c]ourt, in deciding primary custody as it did, improperly reward [Father] for his continued failure to respond to the timely, repeated efforts by [Mother] to discuss the absolute need of the [C]hild for injection therapy which caused such therapy to be delayed and for the [C]hild to remain at risk of becoming seriously ill?

III. That in rendering the decision in this case, did the [t]rial [c]ourt fail to give proper consideration and weight to the fact that [C]hild has [t]wo (2) half-sisters in Texas [] whom she has known since birth and with [whom] she interacts every single day while there and with whom [C]hild has a significant bond?

IV. That in arriving at the conclusion that [Father] should be awarded primary physical custody, did the [t]rial [c]ourt fail to consider and/or give sufficient weight to the fact that

although both parties were previously ordered to do so, it was the [M]other who enrolled the minor child in counseling and [F]ather delayed in doing so?

V. That in deciding that [F]ather should have primary physical custody, did the [t]rial [c]ourt fail to consider and/or assign sufficient weight to the fact that [C]hild had already commenced her education in the State of Texas and that [Mother] was very much familiar with her instructors and the school itself while the [Father] did nothing in such regard?

VI. Did the [t]rial [c]ourt err in failing to properly consider and/or give sufficient weight to the fact that the entire medical care team of [C]hild has been, and remains, in Texas, that [M]other was instrumental in establishing same and was quite familiar with all of the providers and that the [M]other was likewise in contact with and familiar with the very few medical providers in Pennsylvania who have seen [C]hild to date?

VII. That in granting [F]ather primary physical custody of the subject child, did the [t]rial [c]ourt act contrary to its theretofore stated policy of maximizing the amount of time [C]hild should spend with each parent, an arrangement which could have easily been effectuated through the proposal advanced by [M]other?

VIII. Did the [t]rial [c]ourt err by failing to recognize that it was the failure to timely respond on the part of the [F]ather to the repeated requests by [Mother] to discuss medical issues pertaining to [C]hild which led to the delay in [C]hild being returned to Pennsylvania this Summer, which, in turn, compromised [M]other who, on one hand, was obligated to follow the [o]rder of [t]rial [c]ourt but, on the other hand, had legitimate concerns over the ability of the [F]ather to follow-through with necessary medical care needed by the [C]hild?

IX. Did the [t]rial [c]ourt place undue weight upon the fact that prior contempt proceedings were initiated by the [F]ather while failing to recognize that no actual finding of contempt was ever made against [M]other and that such prior proceedings were resolved via agreement between the parties?

X.     Did the [t]rial [c]ourt err by failing to place proper weight on the false testimony by [F]ather that he never agreed to [M]other and [C]hild relocating to the [s]tate [o]f Florida when, in fact, he executed a document evidencing his agreement in such regard?

Mother's Br. at 5-8 (suggested answers omitted; emphasis in original).

In reviewing a custody order, our scope of review is plenary and our standard is abuse of discretion. **V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa.Super. 2012). We accept the trial court's factual findings so long as competent evidence of record supports them; we do not make independent factual determinations. **Id.** In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. **Id.** However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. **Id.** We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court. **Id.** We may reverse only if, giving due deference to the trial court's weight and credibility determinations, we conclude that the trial court committed an error of law or an abuse of discretion. **Hanson v. Hanson**, 878 A.2d 127, 129 (Pa.Super. 2005).

Mother first asserts that the trial court erred in concluding that frequent custody exchanges would not be in Child's best interests. She asserts that the court incorrectly assumed that the parties could not afford for Child to fly back and forth, when she testified that she would pay Child's airfare and presented

testimony regarding Stepfather's income. Mother claims the trial court erroneously assumed that Child was in counseling solely due to difficulty in adjusting to the frequent custody exchanges. Rather, according to Mother's testimony, Child was in counseling so she would have "someone to discuss things that she does not wish to discuss with her parents and . . . to assist her in ways that her parents simply cannot." Mother's Br. at 20. Mother states that custody exchanges had been taking place primarily by automobile every three months, and Child has not found adjusting to the time difference to be difficult.

Mother next argues that the trial court erred in awarding Father primary physical custody because he does not cooperate with Mother regarding Child's medical care, resulting in delays. Mother asserts that the trial court did not consider Father's failures in this regard, despite Mother's introduction into evidence of supporting correspondence, and Father's testimony that he did not know why he did not respond. Mother also argues that Father did not contradict her testimony that Child did not have any dental care while she was in Father's custody, resulting in seven cavities.

Third, Mother asserts that the trial court failed to give adequate weight to Child's relationships with her two half-siblings who reside with Mother. Mother notes that the trial testimony that Child has known her two half-siblings since birth and has contact with them on a daily basis while in Mother's care. Mother states that, conversely, there was no testimony regarding Child's

relationship with Father's other child, who is in Father's custody only four days a week.

Fourth, Mother argues that the court did not give sufficient weight to the fact Father delayed enrolling Child in counseling in Pennsylvania, even though the court ordered both parties to do so. Father testified at trial that he called the office in an attempt to schedule therapy, but never received a response. In addition, Mother testified that she proactively enrolled Child in counseling in Texas.

Next, Mother argues that the trial court failed to give proper consideration that Child has attended pre-school and pre-kindergarten in Texas, and Mother is familiar with the instructors and school Child would attend if Mother had primary custody. She asserts that the trial court failed to recognize that "[Mother] is the one who has been fully invested in the schooling of [C]hild."

In her sixth issue, similar to her second and fourth, Mother argues that court did not give due consideration to the fact that she has been more responsible for Child's physical and mental health needs.

In her seventh issue, Mother argues that the trial court erred in awarding primary physical custody to Father because it was contrary to the trial court's previously expressed policy of maximizing the amount of time Child would spend with each parent. According to Mother, placing Child with her would maximize the time Child would spend with her parents, as Child would visit Father for a two week period every nine weeks during the school

year, in addition to holidays and summer vacation, whereas Mother will receive less custody time if Child resides in Pennsylvania during the school year. Mother does not argue that maximizing time with both parents is a statutory factor that the court must consider when deciding custody matters, but that the court was obligated to discuss the possible effect of any proposed transfer of custody, and that the trial court erred by failing to engage in such a discussion.

In her eighth issue, Mother argues that the trial court erred when it blamed Mother for failing to exchange physical custody of Child, when she did so out of concerns for Child's health needs and Father's failure to discuss them. Mother repeats her references to Father's lack of response regarding Child's tonsil removal and immunotherapy injections, which resulted in Mother's scheduling the tonsil removal on a date after a custody exchange should have occurred.

Similarly, in her ninth issue, Mother argues that the trial court placed undue weight on the fact that Father had initiated contempt proceedings against Mother. According to Mother, the court gave too great of weight to the contempt petition, when she had returned Child to Father late so that Child could participate in a school Christmas recital, which, according to Mother, was mandatory; Father withdraw the petition and the court made no finding of contempt; and Father received "make-up" custody time by agreement.

Finally, Mother contends that the trial court erred in crediting Father's testimony that Mother had relocated to Florida with Child without Father's

agreement, when Mother presented evidence that Father had agreed to the relocation.

Mother is due no relief. The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa.Super. 2006) (quoting **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa.Super. 2004)).

In awarding custody, a court must determine the best interest of the child after considering all relevant factors, including certain statutory factors:

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>>
>> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>>
>> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>>
>> (3) The parental duties performed by each party on behalf of the child.
>>
>> (4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

In a custody case where neither parent is relocating, but the children stand to move a significant distance, trial courts should consider the relevant relocation factors of 23 Pa.C.S. § 5337(h) in their Section 5328(a) best

interests analysis. ***D.K. v. S.P.K.***, 102 A.3d 467, 476 (Pa.Super. 2014).

Section 5337(h) provides:

> **(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's preference, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
>
> (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.
>
> (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.
>
> (8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Mother's issues in this appeal are interrelated and we will therefore address them together. Her arguments generally amount to an attack on the trial court's assessment of the custody factors. For example, she argues that the court did not sufficiently consider her complaints about Father's failure to cooperate and communicate regarding Child's medical care. However, the court had the authority to resolve the conflicting testimony on this point in Father's favor. Mother's also asserts that the court failed to consider Child's relationship with Mother's two other children. To the contrary, the court did consider these relationships (as well as Child's relationship with her other half-sibling), but simply did not give this factor as much weight as Mother would have preferred.

Mother's arguments at bottom invite us to find different facts, re-weigh evidence, and re-assess credibility. This we cannot do. Here, the trial court listed in its Pa.R.A.P. 1925(a) opinion all of the Section 5328(a) custody factors, as well as the Section 5337(h) relocation factors, and analyzed all of those factors based on the evidence of record. As the trial court's findings and determinations regarding the custody and relocation factors set forth in Sections 5328(a) and 5337(h) are supported by competent evidence in the record, we will not disturb them.

Last, we address Mother's complaint that the trial court's award was error as it did not maximize the amount of time Child could spend with each parent while maintaining a single educational environment. Mother argues the court failed to discuss the possible effects of the custody arrangement, and in support cites **E.A.L. v. L.J.W.**, 662 A. 2d 1109, 1117 (Pa. Super. 1995). However, we decided **E.A.L.** before the enactment of the Section 5328(a) custody factors, and therefore our decision there is of limited value here. Further, while **E.A.L.** instructs that courts should "fully discuss" the effects that transferring custody may have on a child, this Court has more recently explained that no particular amount of detail is required when discussing the section 5328(a) factors. **See A.V. v. S.T.**, 87 A.3d 818, 823 (Pa.Super. 2014).

Regardless, even applying **E.A.L.** to the instant matter, the trial court's discussion of the effect a change in custody might have on Child was more than sufficient. The trial court carefully examined the evidence before it and considered the impact that the parties' proposed custody schedules would have on Child before entering the final custody order. The court emphasized that it had designed its custody order, in part, to reduce the amount of travel that Child would face, and to provide primary custody to Father, as it found these to be in Child's best interest. Mother in fact acknowledges the court was not required to maximize Child's time with each parent, but to arrange custody in a manner that was in Child's best interests. **E.A.L.** affords no basis on which to disturb the custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/10/18